# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

American Family Mutual Insurance
Company; American Family Life Insurance
Company; and American Standard Insurance
Company,

       **Civil File No: 12-cv-53 MJD/SER**

       Plaintiffs,

v.

       **ORDER**

Steven G. Graham and Steven Graham
Agency, Inc.,

       Defendants.

---

     Christina C.K. Semmer, Colton D. Long, Martin S. Chester, and Justin P. Krypel, Esqs., Faegre Baker Daniels LLP, 90 South Seventh Street, Suite 2200, Minneapolis, Minnesota 55402, for Plaintiffs.

     Geoffrey P. Jarpe, Esq., Maslon Edelman Borman & Brand, LLP, 90 South Seventh Street, Suite 3300, Minneapolis, Minnesota 55402, for Defendants.

---

STEVEN E. RAU, United States Magistrate Judge

     The above-captioned case comes before the undersigned on Defendants Steven G. Graham ("Graham") and Steven Graham Agency, Inc.'s (the "Graham Agency") (collectively, "Defendants") Motion to Amend Their Amended Counterclaims [Doc. No. 36], Defendants' Supplement to Motion to Amend Their Amended Counterclaims [Doc. No. 51],[1] and Plaintiffs American Family Mutual Insurance Company, American Family Life Insurance Company, and American Standard Insurance Company's (collectively, "American Family") Motion to Compel

---

[1]    The docket describes this document as a Supplemental Motion. For the purposes of this Order, the Court will defer to Defendants' title of "Defendants' and Counterclaimants' Supplement to Motion to Amend their Amended Counterclaims."

Discovery [Doc. No. 44]. For the reasons stated below, the Court denies Defendants' Motions to Amend the Amended Counterclaims and denies American Family's Motion to Compel.

## I.    BACKGROUND

### A.    Factual Background

American Family sells commercial and personal insurance products in nineteen states, using insurance agents and agencies across the country. (Compl.) [Doc. No. 1 ¶¶ 6–7].[2] American Family's agents only represent American Family and its insurance products; they do not represent multiple insurance companies. (*Id.* ¶ 8).

American Family hired Graham as an insurance agent, and both parties executed an American Family Agent's Agreement on or around January 6, 1988 (the "1988 Agreement"). (*Id.* ¶¶ 11–12). Through the 1988 Agreement, Graham had the opportunity to earn commission by selling insurance policies to American Family customers, and "agreed that if he left American Family he would limit his competitive activity against American Family for one year." (*Id.* ¶¶ 12, 14). He also became eligible to earn deferred compensation, called "Extended Earnings," that would be paid to him after he left the company. (*Id.* ¶ 13). In exchange, American Family provided Graham with training, resources that allowed him to maintain an American Family office, and the support of American Family supervisors and staff. (*Id.* ¶ 12). Throughout his tenure at American Family, Graham worked in the Minneapolis-St. Paul area. (*Id.* ¶ 11).

Graham successfully grew his customer base, and signed a new American Family Agent Agreement in 1993 (the "1993 Agreement") that was substantially similar to the 1988 Agreement. (*Id.* ¶¶ 15, 17). In 1996, Graham formed the Graham Agency, which allowed him

---

[2]    These paragraph numbers refer to the paragraph numbers in the body of the Complaint, not the paragraph numbers associated with the "Prayer for Relief" heading.

to hire staff and supervise other employees licensed to sell insurance. (*Id.* ¶ 18). Graham entered into a new contract with American Family on behalf of himself and the Graham Agency on January 1, 1996 (the "1996 Agreement"), with terms substantially similar to the 1988 and 1993 Agreements. (*Id.* ¶ 19). Specifically, the 1996 Agreement prohibited Graham, as a shareholder, officer, and licensed sales representative of the Graham Agency, from

> either personally or through any other person, agency, company or organization directly or indirectly induc[ing], attempt[ing] to induce or assist[ing] anyone else in inducing or attempting to induce any policyholder of the Companies credited to Agent's account at the time of termination to lapse, cancel, replace or surrender any insurance policy in force with the Companies.

(*Id.* ¶¶ 23–24). This section of the 1996 Agreement is called the "Activity After Termination" provision, and is substantially similar to provisions with the same title in the 1988 and 1993 Agreements. (*Id.* ¶¶ 23, 25). Under the 1996 Agreement, any violation of the "Activity After Termination" provision would cause Graham to "immediately forfeit all rights to [E]xtended [E]arnings otherwise payable by American Family." (*Id.* ¶ 26 (internal quotations omitted)).

Graham continued to be successful. (*Id.* ¶ 29). American Family named him an All-Star Agent in 2001, and continued to promote and support his business, including featuring him in its company newsletter. (*Id.* ¶¶ 29–30).

American Family terminated Defendants' affiliation on January 7, 2011, "after an investigation of certain business practices." (*Id.* ¶ 32). Shortly thereafter, American Family reminded Graham of his obligations following termination, and stated that it intended to pay him the Extended Earnings provided for in the 1996 Agreement. (*Id.*).

Soon after American Family terminated its agreement with Graham, Graham began reaching out to his former American Family customers and attempted "to induce them to leave American Family." (*Id.* ¶ 33). American Family reminded Graham via letter of his obligations

not to induce or attempt to induce policyholders to let their policies lapse, replace their polices, or surrender their American Family policies. (*Id.* ¶ 34). Graham's attorney responded that Graham was not inducing customers. (*Id.* ¶ 35).

Graham sent a letter to some or all of his former American Family customers on February 24, 2011. (*Id.* ¶ 36). The letter announced that Graham no longer represented American Family and instead, the Graham Agency was affiliated with Insurance Brokers of Minnesota, Inc., "a consortium of insurance companies that compete with American Family." (*Id.*). Graham described his non-compete with American Family as limiting him "in certain respects," and told his former American Family customers that, to honor the agreement, he would not "solicit or induce [them] to change any current account which [they] now hold with American Family." (*Id.* ¶ 38). He also said that he could offer customers insurance policies for needs not covered by their current American Family policies. (*Id.* ¶ 39). Graham said the Graham Agency was superior to American Family, now that it was independent. (*Id.* ¶ 41). He invited his customers to contact him and visit his new website, and he provided his contact information. (*Id.* ¶¶ 42–43). Graham's website touted his new status as an independent agent, and described the virtues of having an agent who is not "held captive by one company." (*Id.* ¶ 44).

American Family alleges that Graham's claim only to offer to sell new policies to his former American Family customers was a "ruse," and Graham intended to induce customers to switch their policies from American Family to its competitors. (*Id.* ¶¶ 45–46).

American Family told Graham's attorney that it believed Graham's letter violated the termination provisions. (*Id.* ¶ 47). Graham's attorney replied that he "reject[ed] American Family's characterizations." (*Id.*). Following this exchange, American Family claims that Graham induced American Family customers to replace their insurance coverage with coverage

sold by the Graham Agency.  (*Id.* ¶¶ 48–51).  As a result, American Family alleges it lost

policies at a rate 50% higher than its normal attrition rate for American Family policies.  (*Id.*

¶¶ 52–57).

### B.    Procedural History

American Family sued Defendants for breach of contract, tortious interference, and

declaratory judgment.[3]  (*Id.* ¶¶ 58–74).  Defendants answered the Complaint and made a

counterclaim for breach of contract.  (Defs.' Answer to Pls.' Compl. & Countercl., "Defs.'

Answer & Countercl.") [Doc. No. 4].  Following the parties' stipulation and subsequent Court

Order, Defendants filed an answer and amended counterclaims.  (Order Dated Aug. 10, 2012)

[Doc. No. 24]; (Defs.' Answer to Pls.' Compl. & Am. Countercls., "Am. Countercls.") [Doc. No.

25].  American Family represented that its answer to the counterclaims was filed as Document

Number 20.  (Answer to Defs.' Am. Countercls.) [Doc. No. 20];[4] (Letter from David M. Aafedt,

former counsel for Defendants, to the Honorable Steven E. Rau, United States Magistrate Judge

(July 30, 2012)) [Doc. No. 21].[5]  Defendants' amendment added counterclaims for conversion

and civil theft, which the Court has since dismissed pursuant to the parties' stipulation.  (Am.

Countercls. at 10–12); (Order Dated Aug. 13, 2013, "Aug. 2013 Order") [Doc. No. 66].

Defendants' amended counterclaims also included a counterclaim for defamation.  (Am.

Countercls. 12–13).  Defendants allege that, in February 2012, Terry Jones ("Jones"), a district

---

[3]    American Family requests a declaratory judgment that that the contract is valid, Defendants breached the contract, Defendants must forfeit Extended Earnings, and that American Family is not obligated to pay Defendants Extended Earnings.  (*Id.* ¶ 74).

[4]    Document number 20 is listed on CM/ECF as a reply to Defendants' motion to amend their counterclaims, which was later withdrawn in favor of the stipulation.  This Order defers to American Family's title of "Answer to Defendants' Amended Counterclaims."

[5]    David M. Aafedt no longer represents Defendants.  (Notice of Withdrawal of David M. Aafedt) [Doc. No. 28].

manager for American Family Mutual Insurance Company, told an American Family agent that the "Department of Insurance has not only gone to pull his license, but he is probably going to get, I mean, could get jail time, not just fines." [6] (*Id.*); *see also* (Affidavit of Geoffrey P. Jarpe in Supp. of Mot. to Amend the Am. Countercls. ¶ 5, "Jarpe Aff." or "Jarpe's Affidavit"); (Ex. A (recording of the allegedly defamatory statements), Attached to Jarpe Aff., the "Recording"); (Ex. B at 2 (transcript of the allegedly defamatory statement), Attached to Jarpe Aff., the "Transcript" or "Tr.").[7] Defendants allege the statements referred to Steven Graham. (Am. Countercls. at 12–13). Defendants also allege that the statement was false, was without factual basis, and was made maliciously "in order defame, injure[,] and damage [] Graham's reputation, business, and ability to earn a living, with the added effect of likewise damaging [the Graham Agency]." (Am. Countercls. at 13).

On June 5, 2013, Defendants moved this Court to amend their counterclaim for defamation to include a claim for punitive damages. (Defs.' & Counterclaimants' Mot. to Amend Their Am. Countercls.) [Doc. No. 36].[8] Several hours later on the same day, American Family moved to compel the reopening of Graham's individual deposition to require him to answer questions regarding the identity of the person who provided the Recording to Graham or his attorney. (Mot. to Compel Disc.) [Doc. No. 44]; (Pls.' Mem. Supporting Their Mot. to Compel Disc., "Am. Family's Disc. Mem.") [Doc. No. 46 at 11]. The parties filed their

---

[6]     The American Family agent to whom Jones spoke is later identified in the record as Gordon Steinweg ("Steinweg"). (Defs.' & Counterclaimants' Mem. in Opp'n to Mot. to Compel Disc., "Defs.' Disc. Resp.") [Doc. No. 53 at 2].

[7]     Jarpe's Affidavit and accompanying exhibits were filed under seal.

[8]     The following day, Defendants provided their proposed amended counterclaims and a redlined document comparing the proposed amended counterclaims with the previous counterclaims. (Defs.' & Counterclaimants' Supplement to Mot. to Amend Their Am. Countercls.) [Doc. No. 51].

respective responses on June 12, 2013. (Defs.' Disc. Resp.); (Pls.' Mem. Opposing Mot. to Add Countercl. for Punitive Damages) [Doc. No. 54]. American Family filed a reply on June 17. (Pls.' Reply Mem. Supporting Mot. to Compel Disc., "Am. Family's Disc. Reply") [Doc. No. 55].[9]

During oral argument, Defendants' attorney offered and the Court accepted an excerpt of the deposition of Austin R. Caves ("Caves") on December 17, 2010 as an exhibit in support of their motion to add a claim for punitive damages. (Minute Entry Dated June 19, 2013). American Family responded to the exhibit by letter. (Letter from Martin S. Chester, counsel for American Family, to the Honorable Steven E. Rau, United States Magistrate Judge (June 24, 2013), "June 2013 Letter") [Doc. No. 60].

## II. DISCUSSION

### A. Defendants' Motion to Include a Punitive Damages Claim

#### 1. Legal Standard

Because a claim for punitive damages may not be included in an initial civil complaint, Defendants now move to include punitive damages in their Amended Counterclaims. (Mem. of

---

[9] During oral argument, Defendants' counsel noted that replies for nondispositive motions are not permitted by the Local Rules. *See* LR 7.1(b)(3). But the undersigned's Pretrial Scheduling Order permits a reply for a nondispositive motion as long as it is provided to opposing counsel and the undersigned's chambers by 12:00 p.m. two business days before the hearing, and as long as the reply does not exceed 1750 words, yielding a total word count of 12,000 for both the original and reply memoranda. (Pretrial Scheduling Order Dated Apr. 23, 2012) [Doc. No. 11 at 3]. (Although the Pretrial Scheduling Order does not have page numbers, this Order refers to the first page as page 1, the second page as page 2, etc.) American Family's original memorandum contained 2615 words and its reply contained 1413 words, bringing its total word count well within the 12,000-word maximum. *See* (LR 7.1 Word Count Compliance Certificate Regarding Pls.' Mot. to Compel Disc.) [Doc. No. 46-1]; (LR 7.1 Word Count Compliance Certificate Regarding Pls.' Reply Mem. Supporting Mot. to Compel Disc.) [Doc. No. 55-1]. American Family's Reply was also timely provided to chambers and will therefore be considered in support of its Motion to Compel.

Law in Supp. of Mot. to Amend the Am. Countercls. at 1, "Defs.' Countercls. Mem.");[10] *see also* Minn. Stat. §§ 549.191, 549.20. Minnesota law governs the issue of punitive damages, which may be awarded in defamation per se cases in Minnesota without proof of actual damages. *Hern v. Bankers Life Cas. Co.*, 133 F. Supp. 2d 1130, 1135–36 (D. Minn. 2001) (JMR/RLE) (citing *Stuempges v. Parke, Davis & Co.*, 297 N.W. 2d 252, 259 (Minn. 1980)). The Court serves as a gatekeeper to prevent frivolous punitive damages claims. *Romano v. ReliaStar Life Ins. Co.*, No. 12-cv-137 (SRN/JJK), 2012 WL 5907397, at *4 (D. Minn. Nov. 26, 2012). "Punitive damages are intended to punish a [party], or to make an example of [that party's] wrongdoing . . . ." *Ulrich v. City of Crosby*, 848 F. Supp. 861, 867 (D. Minn. 1994) (RLE); *see also Longbehn v. Schoenrock*, 727 N.W.2d 153, 161 (Minn. Ct. App. 2007).

A motion for punitive damages "must be accompanied by one or more affidavits showing the factual basis for the claim." Minn. Stat. § 549.191. "Characterizations of the evidence and conclusory statements" are not evidence and "add nothing" to a prima facie showing. *Stepnes v. Ritschel*, Case No. 08-cv-5296 (ADM/JJK), 2010 WL 7093560, at *6 n.3 (D. Minn. Apr. 13, 2010). If the Court finds that Defendants provided prima facie evidence, then the Court will allow Defendants to amend their claims to include a claim for punitive damages. Minn. Stat. § 549.191. Prima facie evidence is evidence that would support a judgment in Defendants' favor if unrebutted. *Healey v. I-Flow, LLC*, 853 F. Supp. 2d 868, 873 (D. Minn. 2012) (JRT/JJK). In making its determination,

> the Court makes no credibility rulings, and does not consider any challenge, by cross-examination or otherwise, to [the movant's] proof, but the Court must carefully scrutinize the evidence presented by the moving party to make sure that it amounts to a prima facie showing that the substantive requirements for punitive damages have been met.

---

[10]     This document was filed under seal.

*Id.* Defendants are required only to demonstrate an entitlement to allege punitive damages; they not required to demonstrate an entitlement to punitive damages per se. *Ulrich*, 848 F. Supp. at 867.

To successfully make a punitive damages claim under Minnesota law, Defendants must present clear and convincing evidence that American Family "show[ed] deliberate disregard for the rights or safety of [Graham]." Minn. Stat. § 549.20. American Family acted with deliberate disregard if it

> has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of [Graham] and:
>
> (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of [Graham]; or
>
> (2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of [Graham].

*Id.* In other words, if American Family acted with intent or indifference to threaten Graham's rights, it operated with deliberate disregard. *Berczyk v. Emerson Tool Co.*, 291 F. Supp. 2d 1004, 1008–09 (D. Minn. 2003) (RHK/RLE) (citing *Gamma-10 Plastics, Inc. v. Am. President Lines, Ltd.*, 32 F.3d 1244, 1255 (8th Cir. 1994)); *see also Longbehn*, 727 N.W.2d at 162.

In other words, the Court considers whether a jury reviewing Defendants' unrebutted evidence reasonably could conclude that there is clear and convincing evidence that American Family knew of facts or intentionally disregarded facts that created a high probability that Jones communicated false statements that would tend to harm Graham's reputation or lower his esteem in the community. *See Hern*, 133 F. Supp. 2d at 1135–36. The determination is discretionary, but if the motion and affidavits "do not reasonably allow a conclusion that clear and convincing evidence will establish that [American Family] . . ." deliberately disregarded Graham's rights,

the Court will not allow the amendment. *Gamma-10 Plastics, Inc.*, 32 F.3d at 1255 (citing

*Utecht v. Shopko Dep't Store*, 324 N.W.2d 652, 654 (Minn. 1982) and quoting *Swanlund v.*

*Shimano Indus. Corp.*, 459 N.W.2d 151, 154 (Minn. Ct. App. 1990) (internal quotations

omitted)).[11]

### 2.    Analysis

Defendants allege that Jones's statements, that the Minnesota Department of Insurance

was going to pull Graham's license and that Graham "could get jail time, not just fines[,]"

constitute defamation per se. (Defs.' Countercls. Mem. at 2); (Am. Countercls. at 12–13).

Defendants further allege that Jones acted with deliberate disregard because American Family

knew why Graham was terminated, and those reasons did not result in a revocation of Graham's

insurance license or criminal charges. (Defs.' Countercls. Mem. at 2–3 (citing Compl. ¶ 32)).

### a.    Defendants' Evidence

Defendants offer various types of evidence to support their motion to a include punitive

damages claim. First, Defendants point to an internal American Family memorandum stating

that American Family investigated its concerns about some of Graham's business practices, and

the investigations substantiated those concerns. (Mem. from Robert Loughran ("Loughran"),

Corporate Compliance, to Leona Simonett ("Simonett"), D-056, copying Caves, C. Listau, R.

Packard, S. Seymour (Oct. 1, 2010), Ex. D, Attached to Jarpe Aff., the "Loughran Memo"); *see*

---

[11]     Effective May 4, 1990, Minnesota changed its punitive damages statute standard from whether the defamer showed "willful indifference" to "deliberate disregard." *See Ulrich*, 848 F. Supp. at 868 (internal citations omitted). *Swanlund* was decided in August 1990; presumably, the actions at the root of the punitive damages claim occurred before the change from "willful indifference" to "deliberate disregard" became effective earlier that year because the Minnesota Supreme Court uses the "willful indifference" standard throughout its opinion. *See generally*, *Swanlund*, 459 N.W.2d 151. Regardless of the standard, the motion and supporting affidavits must still "reasonably allow" the conclusion that clear and convincing evidence is present. *Id.* at 154.

*also* (Jarpe Aff. ¶ 10).  Because Jones did not talk about the specific business practices that were the subject of American Family's investigation, Defendants claim Jones's statements "exhibit intentional disregard of the facts and indifference to the high probability of injury to the affected persons' rights."  (Defs.' Countercls. Mem. at 3).

Second, Defendants assert that *Keating v. Prudential Cas. Co.*, 140 Minn. 391, 168 N.W. 178 (1918) is applicable.  (*Id.* at 3–4).  In *Keating*, statements that suggested an insurance agent diverted premiums for his personal use constituted libel, and the Minnesota Supreme Court affirmed a jury verdict that correspondence related to the plaintiff's discharge and his right to commission based on premiums constituted malice.  (*Id.*).

Third, Defendants submitted counsel's affidavit and six exhibits, some previously described in this Order.  Defendants' counsel, Geoffrey P. Jarpe, avers that he has "knowledge of the matters hereinafter set forth."  (Jarpe Aff. ¶ 1).  Jarpe states that he received a copy of the Recording and that he agreed "to maintain the identity of the source in the strictest of confidence . . . ."  (*Id.* ¶ 2).  Exhibits A and B are a copy of the Recording and a transcript of the Recording, respectively.  (Recording); (Tr.).  Jarpe avers that the two people on the Recording are a now-retired American Family agent, Steinweg,[12] and Jones.[13]  (Jarpe Aff. ¶ 4).  Jarpe describes Jones as "a managerial employee of American Family," and Steinweg as "an independent contractor/American Family agent."  (*Id.*).  Jarpe testifies that the allegedly defamatory statements "were reckless, without supporting factual basis, and in deliberate disregard of [] Graham's rights.  In connection with the termination of [Defendants'] Agency Agreement by [American Family], neither Defendant has been charged with a crime nor has a

---

[12]     Steinweg is identified in the transcript as "Speaker 1."  (Jarpe Aff. ¶ 4).
[13]     Jones is identified in the transcript as "Speaker 2."  (Jarpe Aff. ¶ 4).

proceeding to revoke [] Graham's insurance license occurred." (*Id.* ¶ 6). Jarpe asserts that "[a]s a full-time managerial employee of [American Family], [] Jones was in a position of authority when he made the defamatory statements to an American Family agent in a business meeting. . . . Respondeat superior applies[]" and refers to paragraph 29 of Plaintiffs' Answer to Amended Counterclaims. (*Id.* ¶ 7).[14] Jarpe further states that

> accusing a business man or woman of losing the license necessary to conduct one's profession and of crimes punishable by jail time is a matter of the gravest nature. At the very least, [] Jones intentionally disregarded the facts in making these statements and acted with[] indifference to the high probability of injuring [] Graham's and his company's rights, in violation of Minn. Stat. § 549.20, [s]ubd[iv].1(b). . . . I expect to subpoena either or both [] Steinweg and [] Jones at the trial of this case to testify concerning the [R]ecording and this subject matter.)

(*Id.* ¶¶ 8–9).

The first two exhibits attached to Jarpe's Affidavit relate to the allegedly defamatory statements. *See* (Recording); (Tr.). Exhibit C is a redacted memorandum asking for an investigation of Graham to determine whether he:

- unilaterally and without customer permission increases Coverage A limits on homeowners['] policies at the same time that an inflation adjustment occurs at renewal in order to disguise the entire adjustment as an inflation one;
- provides customers with multi-car discounts even when they do not have a second car insured by American Family; and
- adds the new 525 Matching Endorsements to homeowner policies without customer knowledge or consent.

---

[14] The relevant portion of this paragraph says "American Family admits only that in Mid-February 2012, Terry Jones had a meeting with an American Family agent in that agent's office about business matters." (Pls. Answer to Am. Countercls. ¶ 29).

(Mem. from Rick L. Packard ("Packard") to Loughran (Apr. 1, 2010), Ex. C, Attached to Jarpe Aff., the "Packard Memo");[15] *see also* (Jarpe Aff. ¶ 10). This information is in the first paragraph of the memorandum; the remainder of the memorandum is redacted. (Packard Memo at 1–2). The Loughran Memo states that the investigation was complete, and that the "concerns were substantiated by our investigation as presented below." It includes a heading titled "Coverage A Increases" and the remainder is redacted. (*Id.*)

Exhibit E includes excerpts from Christopher R. Listau's ("Listau") October 31, 2012 deposition. (Ex. E, "Listau Dep.," Attached to Jarpe Aff.). Listau was "American Family's Regional Sales Vice President for the region that included Minnesota[.]" (Jarpe Aff. ¶ 11). Exhibit F includes excerpts from Caves's December 17, 2012 deposition. (Ex. F, "Caves Dep.," Attached to Jarpe Aff.). Caves was American Family's Minnesota State Director, and he reported to Listau. (Jarpe Aff. ¶ 11). Jarpe states that

> [t]hese excerpts describe [Listau and Caves's] roles in reviewing and discussing the American Family Compliance Department report (Exhibit D hereto) in connection with the decision to terminate the Graham Agency's contract with American Family. [] Caves carried out that decision after discussions with [] Listau and an American Family attorney.

(*Id.*). Because Defendants do not direct the Court to specific page or line numbers, the apparently relevant testimony of these depositions is summarized below.

Listau testified that he received what counsel referred to in the deposition as the "Loughran report." (Listau Dep. 21:25–22:10).[16] Presumably, this refers to Exhibit D, the Loughran Memo. Listau stated that he discussed the Loughran Memo with Caves, and possibly

---

[15] Although the affidavit describes the Packard Memo as a memorandum (Jarpe Aff. ¶ 10), it appears to be an email. The Court defers to Jarpe's characterization for the purposes of this Order.

[16] These numbers refer to the page and line numbers as used in the transcript.

Gerry Benusa ("Benusa"), the executive vice president of sales and Listau's direct supervisor. (*Id.* at 22:11–23:5). Benusa was not involved with any decisions regarding the outcome of the investigation. (*Id.* at 29:19–22). Listau testified that he deferred to Caves regarding when to talk to Graham about the investigation. (*Id.* at 27:24–28:12). He said that he expected Caves, Simonett, and Loughran would be involved in the investigation. (*Id.* at 28:13–23). Listau also testified that, during several conversations with Caves between October 1, 2010, and January 7, 2011, Listau advised Caves to work closely with the general counsel's office and the compliance department. (*Id.* at 30:8–31:12).

Caves testified that he was aware of the Laughran Memo, and discussed it with American Family's attorneys, Listau, Leona,[17] and Packard at various times.[18] (Caves Dep. 42:17–43:21; 44:12–17).[19] Caves testified that he met with a Mr. Holman ("Holman") two times during October 2010, and met with Simonett in early November regarding the Loughran Memo. (*Id.* at 49:5–50:24). Holman wanted to follow up with Caves regarding his (Holman's) earlier questions. (*Id.* at 50:13–25). Caves met with Simonett and learned that she did not have any additional information. (*Id.* at 51:1–52:11). Caves reported this to Holman and had several telephone conversations with Holman; some of them may have included Listau. (*Id.* at 52:12–24). Caves testified that, as of November 24, 2010, the decision to terminate American Family's agreement with Graham had been made, and Caves began to make arrangements to notify Graham. (*Id.* at 130:14–132:2). In order to finalize the decision to terminate Graham's

---

[17]     "Leona" likely refers to Leona Simonett. *See* (Loughran Memo).
[18]     This testimony discusses "Loughran Deposition Exhibit 7," which is entitled "Memo," and dated October 1, 2010. (Caves Dep. 42:20–25). "Loughran Deposition Exhibit 7" was not submitted to the Court with the deposition excerpt, but it seems to be the same document as the Loughran Memo.
[19]     These numbers refer to the page and line numbers used in the transcript.

agreement, Caves testified that he was waiting for Listau to review the information, and to create a succession plan with Listau and others. (*Id.* at 132:3–134:2). At this time, Caves had begun preliminary work on the transition plan. (*Id.* at 134:3–11). Graham's termination was scheduled for December 17, 2010, but it did not take place at that time because Listau asked Caves to wait until he (Listau) could speak to upper-level executives. (*Id.* at 136:2–18). Caves assumes Listau spoke to those people. (*Id.* at 136:19–20).

Defendants also filed an affidavit signed by Graham. (Aff. of Steven G. Graham, "Graham Aff.") [Doc. No. 40]. Graham states that he has not "been charged with, nor investigated for, any violations of the criminal laws, and the Minnesota Department of Insurance has not initiated any proceeding to revoke [his] license. The same is true of Wisconsin and Arizona." (*Id.*¶ 2).

### b.      American Family's Opposition

American Family responds that Defendants have not met their burden to present clear and convincing evidence for three reasons. First, American Family claims Defendants have not offered evidence to show that Jones acted in deliberate disregard to Graham's rights. (Pls.' Mem. Opposing Mot. to Add Countercl. For Punitive Damages, "Am. Family's Countercls. Resp.") [Doc. No. 54 at 2–10]. Second, American Family states that it is not vicariously liable for Jones's statements. (*Id.* at 11–13). Finally, American Family alleges the supporting affidavits do not comply with the affidavit requirements for punitive damages because they fail to show the factual basis for the claim. (*Id.* at 13–15).

### c.     Caves Deposition—Supplemental Excerpt

During oral argument (and consistent with its opposition brief), American Family argued that Defendants failed to show that Jones's statements could be imputed to American Family as required by the Minnesota punitive damages statute.  Subdivision 2 of that statute states that

> [p]unitive damages can properly be awarded against a master or principal because of an act done by an agent only if:
>
> (1)     the principal authorized the doing and the manner of the act;
>
> (2)     the agent was unfit and the principal deliberately disregarded a high probability that the agent was unfit;
>
> (3)     the agent was employed in a managerial capacity with authority to establish policy and make planning level decisions for the principal and was acting in the scope of that employment; or
>
> (4)     the principal or a managerial agent of the principal, described in clause (3), ratified or approved the act while knowing of its character and probable consequences.

Minn. Stat. § 549.20, subdiv. 2.

In response, Defendants' counsel offered, and the Court accepted, an additional excerpt of the Caves deposition.  (Caves Dep., Ex. A, Attached to June 2013 Letter, "Caves Suppl. Dep." or the "Caves Supplemental Deposition Excerpt") [Doc. No. 60 at 4–5].  In it, Caves testified that he was a district sales manager in Duluth, Minnesota.  (Caves Suppl. Dep. 19:2–18).[20] Caves's duties and responsibilities as district manager included managing, supervising, and motivating agents; working with agents on the development and execution of business plans; assisting agents with selling ideas; conducting training meetings regarding selling; meeting agents in their offices, and handling disciplinary situations, including terminations.  (*Id.* at 20:23–21:10).  At oral argument, Defendants' counsel argued this excerpt showed that Jones,

---

[20]     These numbers refer to the page and line numbers as used in the transcript.

who held the same title as Caves (district manager), had "managerial capacity." *See* Minn. Stat. § 549.20, subdiv. 2(3).

American Family's response argues that although the Caves Supplemental Deposition Excerpt shows that Jones had supervisory authority, it did not show that Jones could "establish policy" or "make planning-level decisions" as required by the punitive damages statute. (June 2013 Letter at 2). Additionally, American Family argued that the Caves Supplemental Deposition Excerpt is not about Jones, the person who made the allegedly defamatory statement that Defendants seek to impute to American Family. (*Id.* at 2–3).

### d. Clear and Convincing Evidence

Evidence that is clear and convincing is "more than a preponderance of the evidence[,] but less than proof beyond a reasonable doubt." *Berczyk*, 291 F. Supp. 2d. at 1004 (internal quotations and citations omitted). If "the evidence is sufficient to permit the [j]ury to conclude that it is 'highly probable' that [Jones] acted with deliberate disregard to the rights . . . of [Graham], the 'clear and convincing' standard would be satisfied." *Ulrich*, 848 F. Supp. at 868.

### i. Managerial Capacity

In order for American Family, the principal, to be held liable for punitive damages based on Jones's, the agent's, allegedly defamatory statement, Defendants must show that Jones met one of four conditions. *See* Minn. Stat. § 549.20, subdiv. 2. Defendants allege that Jones "was [American Family's] managerial employee and was acting within the course and scope of his employment. His statements are American Family's statements." (Defs.' Countercls. Mem. at 4). This requirement is a codification of the Restatement (Second) of Torts § 909 (1979) and Restatement (Second) of Agency § 217C (1958). This inquiry is "fact-intensive" and suggests that the Court should review "the type of authority that the employer has given to the employee,

[and] the amount of discretion that the employee has in what is done and how it is accomplished." *Ogden v. Wax Works Inc.*, 214 F.3d 999, 1008–09 (8th Cir. 2000) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 543 (1999) (internal citations and quotations omitted)). Tortious acts are "within the scope of an agent's employment if the conduct is the kind [the employee] is employed to perform, occurs substantially within the authorized time and space limits, and is actuated, at least in part, by a purpose to serve the employer." *Id.* at 1009 (quoting *Kolstad*, 527 U.S. at 543–44 (internal quotations omitted)).

Here, Defendants offer Caves's description of his responsibilities as a district manager to illustrate that Jones had the same responsibilities and because of these responsibilities, American Family can be held liable for punitive damages stemming from Jones's allegedly defamatory statements. Caves testified that he manages, supervises, and motivates agents; works with agents on the development and execution of business plans; assists agents with selling ideas; conducts training meetings regarding selling; meets with agents in their offices, and handles disciplinary situations, including terminations. (Caves Suppl. Dep. 20:23–21:10). But even if Caves's self-described responsibilities are analogous to Jones's responsibilities, Caves did not testify to the level of authority he had or the amount of discretion American Family afforded him. Caves did not testify that he made planning decisions on behalf of American Family or that he had the ability to establish American Family policy. The excerpts of Caves's deposition presented to the Court include some discussion of his role in the decision to terminate Graham. (Caves Dep. 42:17–43:21; 49:5–50:20, 129:14–132:2). But Caves also testifies that the termination was postponed so that his supervisor, Listau, had an opportunity to talk to other "upper-level executives" before the termination took place. (Caves Dep. 136:2–18). This suggests that Caves did not have the authority to proceed with a termination on his own, and therefore fails to

provide clear and convincing evidence that Jones—by analogy to Caves's position—was employed in a managerial capacity.

In support of the assertion that Jones's statements took place within the scope of Jones's employment with American Family, Defendants present only an affidavit signed by their counsel that Steinweg and Jones were both American Family employees and were "at a meeting . . . to discuss American Family business." (Jarpe Aff. ¶ 4). This evidence is merely a conclusion; it is not "more than a preponderance of evidence[.]" *Berczyk*, 291 F. Supp. 2d. at 1008 (stating that clear and convincing evidence is "more than a preponderance of evidence); *see also Stepnes*, 2010 WL 7093560, at *6 n.3.

### ii. Deliberate Disregard

Even if Jones was acting in a managerial capacity such that American Family could be held liable for his statements—a conclusion with which the Court does not agree—Defendants must present clear and convincing evidence that would allow a "[j]ury to conclude that it is highly probable" that Jones acted with deliberate disregard to Graham's rights. *Ulrich*, 848 F. Supp. at 868; *see* Minn. Stat. § 549.20. To act in deliberate disregard, Jones must have had "knowledge of facts or intentionally disregarded facts that create a high probability of injury" to Graham's rights. Minn. Stat. § 549.20. In other words, Defendants must show that Jones knew of or intentionally disregarded the results of American Family's investigation of Graham that ultimately led to the termination of the 1996 Agreement between Defendants and American Family.

In the allegedly defamatory statement, Jones appears to hold himself out as a person who has knowledge of the circumstances surrounding the termination of Defendants' agreement. Aside from the Recording though, Defendants have not presented any evidence, much less clear

and convincing evidence, that Jones was in fact privy to these circumstances. Defendants have not presented evidence that Jones knew that Graham was investigated for certain business practices, or what those business practices were. In the Listau and Caves deposition excerpts, neither person mentions Jones. During oral argument, the parties stated that Jones was not deposed. Therefore, Defendants have not presented statements from Jones himself regarding whether he had knowledge of American Family's investigation into Graham's business practices, whether he knew that the investigation led to the termination decision, or whether he reasonably believed the statements were true at the time he made them. Neither the Recording nor the Transcript—the only evidence submitted that is purported to be from Jones—provide any of this important contextual information.

To show that the statements were false, Defendants present Graham's affidavit that says "the Minnesota Department of Insurance has not initiated any proceeding to revoke [his] license" and that he has not "been charged with, nor investigated for, any violations of the criminal laws . . . ." (Graham Aff. ¶ 2). But this affidavit does not show the factual basis for this claim. *See* Minn. Stat. § 549.191. Graham's affidavit does not explain how he would know whether the Minnesota Department of Insurance initiated a proceeding to revoke his license, or how he would know if he was being investigated for criminal charges. Nor does the affidavit mention any conversation that Graham may have had with Jones that suggests Graham informed him of the investigation, or that Graham otherwise knew that Jones was privy to the details of Graham's termination.

Similarly, Jarpe's Affidavit does not present any factual bases that Jones deliberately disregarded Graham's rights. Jarpe testifies that Jones's alleged statements "were reckless, without supporting factual basis, and in deliberate disregard of [] Graham's rights. In connection

with the termination of Defendants' Agency Agreement by [American Family], neither Defendant has been charged with a crime nor has a proceeding to revoke [] Graham's insurance license occurred." (Jarpe Aff. ¶ 6). He goes on to state, "[a]t the very least, [] Jones intentionally disregarded the facts in making these statements and acted with[] indifference to the high probability of injuring [] Graham's and his company's rights, in violation of Minn. Stat. § 549.20, [s]ubd[iv]. 1(b)." (*Id.* ¶ 8). These statements merely represent argument in support of Graham's position; they are not probative of any factual basis showing Jones deliberately disregarded Graham's rights. *See Berczyk*, 291 F. Supp. 2d at 1012 (extending "little probative weight" to an affidavit that provided "no more than the [a]ffiant's construction of the appended documents, as imbued by his descriptive, and largely unsupported, commentary[]").

The accompanying exhibits meet a similar fate. As discussed above, the Recording and the Transcript provide only the allegedly defamatory statements. They provide no factual basis that Jones deliberately disregarded Graham's rights. Neither the Packard Memo nor the Loughran Memo mention Jones, much less provide any facts relating to his disregard of Graham's rights. Likewise, the Caves and Listau deposition excerpts do not mention Jones or provide any additional facts regarding his regard for Graham's rights.

Defendants' affidavits and accompanying exhibits have not presented clear and convincing evidence that Jones deliberately disregarded Graham's rights. While Jones may not have been well informed when he made the allegedly defamatory statement, a negligent statement is not sufficient to show that he deliberately disregarded Graham's rights. *See Freeland v. Fin. Recovery Servs., Inc.*, 790 F. Supp. 2d 991, 994–95 (D. Minn. 2011) (PAM/TNL) ("'A mere showing of negligence is not sufficient; instead the conduct must be done with malicious, willful, or reckless disregard for the rights of others.'" (quoting *Admiral Merchs.*

*Motor Freight, Inc. v. O'Connor & Hannan*, 494 N.W.2d 261, 268 (Minn. 1992))).  For the foregoing reasons, Defendants' Motion to Amend Amended Counterclaims is denied.

### B.     American Family's Motion to Compel

American Family served Defendants with discovery seeking documents "that reference or relate to the alleged meeting between Terry Jones and an American Family agent in mid-February 2012, as alleged in the Amended Counterclaim."  (Am. Family's Disc. Mem. at 2); *see also* (Pls.' Req. for the Produc. of Docs. to Defs.' (Set 2), Ex. A) [Doc. No. 48-1 at 8].  In response, Defendants provided the Recording, where a voice says the allegedly defamatory statement described in the counterclaim.  (Am. Family's Disc. Mem. at 2).  American Family deposed Graham on December 5, 2012.  (*Id.*).  When counsel asked Graham how he received the Recording, Defendants' counsel objected, stating that he was asked to keep the person's identity confidential and instructing his client not to answer the question.  (*Id.* at 2–3); *see also* (Jarpe Aff. ¶ 2).  American Family requested the information again by letter dated April 1, 2013.  (*Id.* at 3); *see also* ( Decl. of Martin S. Chester in Supp. of Pls.' Mot. to Compel Disc., "Chester Decl.") [Doc. No. 47 ¶ 4].  Defendants' counsel responded, stating the source of the Recording does not fall within the attorney-client privilege, but that because the person who provided the Recording "did so on the condition that the source would be maintained in the strictest confidence[,]" counsel "cannot voluntarily dishonor that commitment."  (*Id.*); *see also* (Letter from Geoffrey P. Jarpe, counsel for Defendants, to Martin S. Chester & Christina C. Semmer, counsel for American Family (Apr. 15, 2013)) [Doc. No. 48-3 at 2].  The parties met and conferred three times, and Defendants' counsel continued to refuse to identify the source of the Recording without a Court order.  (*Id.* at 3–4).  American Family seeks costs and fees associated with bringing the Motion to Compel and with reconvening Graham's deposition.  (*Id.* at 9–10).

Defendants oppose the motion because reopening Graham's deposition is not "reasonably calculated to lead to the discovery of admissible evidence." (Defs.' Resp. at 2 (quoting Fed. R. Civ. P. 26(b)(1))). Defendants claim the speakers on the recording are known—Jones and Steinweg—and therefore only the speakers' information regarding the circumstances of the conversation is relevant. (*Id.*). Defendants also claim that their agreement to the source should be respected because the "Court must strike a balance between a party's need for information and a non-party third person's interest in privacy." (*Id.* at 3 (citing *Onwuka v. Fed. Express Corp.*, 178 F.R.D. 508, 517 (D. Minn. 1997))).

### 1.    Legal Standard

The Federal Rules permit "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter." Fed. R. Civ. P. 26(b)(1). "Broad discovery is an important tool for the litigant, and so '[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.'" *WWP, Inc. v. Wounded Warriors Family Supp., Inc.*, 628 F.3d 1032, 1039 (8th Cir. 2011) (quoting Fed. R. Civ. P. 26(b)(1)). "Rule 26 is to be construed broadly and encompasses 'any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'" *Dobosenski v. CRST Van Expedited, Inc.*, No. 11-cv-2732 (SRN/JSM), 2012 WL 4838871, at *2 (D. Minn. Oct. 11, 2012) (quoting *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1027 (D. Minn. 1997) (PAM)).

But discovery is not boundless. The Rules have been amended to encourage judicial involvement in discovery. *See* Fed. R. Civ. P. 26 advisory committee's note (1983) ("The rule

contemplates greater judicial involvement in the discovery process and thus acknowledges the reality that it cannot always operate on a self-regulating basis."); Fed. R. Civ. P. 26 advisory committee's note 1993 ("Textual changes are then made . . . to enable the court to keep tighter rein on the extent of discovery.); Fed. R. Civ. P. advisory committee's note (2000) (amendments are made "to involve the court more actively in regulating the breadth of sweeping or contentious discovery.")  The Court must limit discovery if it finds that:

(i)     the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

(ii)    the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

(iii)   the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C).  Limits on discovery must be "applied in a common sense[] and practical matter."  *Onwuka v. Fed. Express Corp.*, 178 F.R.D. 508, 516 (D. Minn. 1997) (JRT/RLE) (citations omitted).  The Court has broad discretion to decide discovery motions. *Pavlik v. Cargill, Inc.*, 9 F.3d 710, 714 (8th Cir. 1993).

2.     **Analysis**

a.     **Relevance**

To establish that American Family defamed Graham, Defendants must be able to show that the allegedly defamatory statements were communicated to someone other than Graham, that they were false, and that they tended "'to harm [Graham]'s reputation and to lower him in the estimation of the community.'"  *Besett v. Hegg*, 890 F. Supp. 2d 1076, 1085 (D. Minn. 2012) (JRT/LIB) (quoting *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980)).

Statements that "'falsely accuse a person of a crime, of having a loathsome disease, or of unchastity, or if they refer to improper or incompetent conduct involving a person's business, trade, or profession[]'" are defamatory per se. *Brodkorb v. Minnesota*, No. 12-cv-1958 (SRN/AJB), 2013 WL 588231, at *10 (D. Minn. Feb. 13, 2013) (quoting *Longbehn*, 727 N.W.2d at 158).

The Recording is relevant to the defamation counterclaim because it seems to be the only evidence of the allegedly defamatory statements. Defendants appear to be correct that the speakers on the Recording are identified, but American Family has several questions for Graham that it says would help it learn more about the circumstances regarding the Recording. (Am. Family's Reply at 2). For example, American Family does not know "whether the source heard the alleged statement first-hand; whether anyone else heard the allegedly defamatory statements; who spoke about the conversation with Jones, Steinweg, or Graham; who arranged for the Recording; and who may have information about the nature or import of the statements that Jones allegedly made." (*Id.* (footnote omitted)). American Family states that it may have a privilege defense under Minnesota law, which recognizes that statements made between employees are protected in some instances. *See* (Am. Family's Mem. at 5–6). Additionally, American Family seeks information that is relevant to authenticating the Recording. (*Id.* at 6–7); *see also* Fed. R. Evid. 901.

The Court finds that American Family's proposal to further depose Graham regarding information about the Recording is relevant to Defendants' ability to establish the elements of the defamation claim, American Family's defenses, potential authenticity issues, and other matters that have bearing on this claim. But because American Family had ample opportunity to obtain this information through other means, the Motion is denied.

### b.    Ample Opportunity

American Family learned of the Recording on September 11, 2012, when Defendants produced the Recording to American Family.  (Am. Family's Disc. Mem. at 2); (Chester Decl. ¶ 2).  Defendants deposed Listau on October 31.  (Listau Dep. at 1).  American Family deposed Graham on December 5, and asked him about the source of the Recording.  (Am. Family Disc. Mem. at 2).  Following the instruction of his attorney, Graham refused to answer questions regarding how he came into possession of the Recording.  (*Id.* at 2–3).  Defendants deposed American Family employee Caves on December 17.  (Caves Dep. at 1).  Based on the excerpts submitted to the Court, American Family did not question Listau or Caves about Jones or his involvement in American Family's investigation into Graham.  *See generally* (Listau Dep.); (Caves Dep.); (Caves Suppl. Dep.).

Nearly four months after Graham's deposition, American Family, apparently for the first time, wrote to Defendants' attorney regarding the source of the Recording.  (Am. Family's Disc. Mem. at 3); (Chester Decl. ¶ 4).  The parties met and conferred three times, and Defendants continued to refuse to provide information regarding the Recording. (Am. Family's Disc. Mem. at 3–4); (Chester Decl. ¶ 6–7).  Discovery closed on May 17, 2013, and the parties filed the instant Motions on June 5.  (Order Dated Feb. 6, 2013 (extending discovery deadline)) [Doc. No. 32 at 2]; (Defs.' & Counterclaimants' Mot. to Amend Their Am. Countercls.); (Pls.' Mot. to Compel Disc.).  The docket number assigned to the parties' respective Motions show that Defendants' Motion was filed before Plaintiffs' Motion, which may imply that Plaintiffs' Motion to Compel was a response to Defendants' Motion seeking to add a punitive damages claim.  *Compare* (Defs.' & Counterclaimants' Mot. to Amend Their Am. Countercls.) [Doc. No. 36] *with* (Pls.' Mot. to Compel Disc.) [Doc. No. 44].  Thus, six months passed between Graham's

deposition and American Family's Motion bringing the dispute over the Recording to the Court's attention. During nearly all of that time, discovery was ongoing.

Based on the timeline outlined above, the Court believes American Family had ample opportunity to use other discovery procedures to obtain the information it now seeks. *See* Fed. R. Civ. P. 26(b)(2)(C)(ii). A few examples illustrate these opportunities: American Family waited almost exactly four months before raising the issue about information that it now considers of such importance it is the subject of this Motion to Compel. In the interim, American Family could have used other discovery methods, such as interrogatories or additional depositions, to formally require Defendants to provide more information about the Recording. At oral argument, counsel for American Family advised the Court that Jones and Steinweg, the participants in the conversation that led to the allegedly defamatory statements, are no longer American Family employees, and that they may not be considered under its control.[21] But American Family could have deposed either person. During a deposition (or by affidavit if a less formal process was available), Jones could have testified to his knowledge of the Graham investigation at the time he allegedly made the statements, provided the relevant context of the conversation, described whether only he and Steinweg were present during the conversation, claimed that he did not make the statements, or claimed that the statements were made for a purpose that would lead to a qualified privilege, as suggested by American Family. *See* (Am. Family's Mem. at 5–6). Steinweg similarly could have testified to the context of the conversation, whether only he and Jones were present during the conversation, and whether

---

[21]     Also during oral argument, American Family's attorney suggested that the context of his conversation with Jones was protected by the attorney-client privilege due to Jones's capacity as a former American Family employee.

Jones made the statements. American Family could have cross-examined Caves or Listau during their depositions regarding Jones's involvement, if any, in the Graham investigation.

American Family thus had ample opportunity between the time it knew of the Recording's existence and the time it filed its Motion to seek the information it requires regarding the Recording through other discovery methods. The Court therefore will not order a deposition to be reopened after discovery has closed. American Family's Motion to Compel Discovery is denied, but the events giving rise to this Motion merit additional comment.

### c. Privacy

Defendants' argued that the source's privacy outweighs American Family's need for information. (Defs.' Disc. Resp. at 3–5). In denying this Motion, the Court is not condoning Defendants' insistence that the Court be bound by a private agreement not premised on any legal principle with a party over whom the Court exercises no jurisdiction.

Obviously, the source of the Recording did not want to be involved in litigation and extracted a promise to that effect from Graham and his attorney. *See* (Jarpe Aff. ¶ 2). While the Court understands Graham and his counsel's intentions to keep their word, the source of the Recording voluntarily interjected itself into this litigation in an effort to assist Defendants. Under these circumstances, that party cannot expect or even demand that the Court respect its desire for privacy. The cases Defendants cite in support of protecting the source's privacy are distinguishable from this situation and do not provide a foundation for the Court to uphold a private agreement. *See* (Defs.' Disc. Resp. at 3–5). Protecting this person's privacy based solely on Graham and his counsel's commitment thwarts this Court's role in overseeing discovery and promoting "the just, speedy, and inexpensive determination" of this case. *See* Fed. R. Civ. P. 1.

### III. SEALED DOCUMENTS

Defendants filed their Memorandum in Support of Motion to Amend the Amended Counterclaims [Doc. No. 38] and Jarpe's Affidavit (including all attached exhibits) [Doc. No. 39] under seal.[22]  The parties' stipulated protective order notes that designating documents as "'Confidential' . . . cannot be used as the sole basis for filing the document under seal in connection with a nondispositive, dispositive or trial-related motion."  (Stipulation for Protective Order) [Doc. No. 17 ¶ 19]; *see also* (Protective Order (entering the Stipulation for Protective Order as the Order of the Court)) [Doc. No. 19].   The parties agreed to comply with "the Electronic Case Filing Procedures for the District of Minnesota and the Court's governing pretrial scheduling order addressing the service and delivery of 'Confidential' materials on a party opponent and the Court."  (Stipulation for Protective Order ¶ 19).  The Court limits sealed filings to "those portions of a party's submission which otherwise meet the requirements of protection from public filing under the attorney-client privilege, work product doctrine, or the standards articulated in Fed. R. Civ. P. 26(c)(1)."  (Pretrial Scheduling Order) [Doc. No. 11 at 4].[23]   Because Defendants have not articulated any reasons why its Memorandum or Jarpe's Affidavit and the accompanying exhibits should be sealed, those documents are ordered unsealed.

---

[22]     The document numbers refer to placeholders filed on CM/ECF.
[23]     Although the Pretrial Scheduling Order does not have page numbers, the Court considers the first page page 1, the second page page 2, etc.

## IV.    CONCLUSION

Accordingly, based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendants' Motion to Amend Their Amended Counterclaims [Doc. No. 36] is **DENIED**;

2.    To the extent Defendants' and Counterclaimants' Supplement to Motion to Amend Their Amended Counterclaims [Doc. No. 51] is considered a separate motion, it is **DENIED**;

3.    Plaintiffs' Motion to Compel Discovery [Doc. No. 44] is **DENIED**; and

4.    Defendants' Memorandum in Support of Motion to Amend the Amended Counterclaims [Doc. No. 38] and the Affidavit of Geoffrey P. Jarpe in Support of Motion to Amend the Amended Counterclaims (including all attached exhibits) [Doc. No. 39] be unsealed.


Dated: September 9, 2013

 *s/Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge